## Mead Appeal

370

*Joseph Malizia,* for appellant.

*David W. Swanson,* for appellee.

FLICK, P. J., June 27, 1967.—This is an appeal to the court of common pleas from the tax assessment for the year 1966 (the case heading shows the year 1965 but the appeal, as amended, shows that it was taken from the assessment for the year 1966), as fixed by order of the Warren County Board of Assessment and Revision of Taxes for certain oil and gas-producing properties in Mead, Pleasant and Conewango Townships, Warren County, owned by Blain M. Mead, some in fee and some under oil and gas leases, giving him the exclusive right to drill for and produce oil and gas from the properties, which appear on the tax assessment rolls as follows:

|  |  | *Total Production* | *Daily Average* | *Assessment* |
|---|---|---|---|---|
| Mead Twp. ..... | Lot #460... | $2,972.71 | 8.15 | $ 4,890 |
| Mead Twp. ..... | Lot #470... | 6,212.41 | 17.02 | 10,212 |
| Pleasant Twp. .. | Lot #471... | 20.45 | .06 | 36 |
| Pleasant Twp. .. | Lot #472... | 93.07 | .26 | 156 |
| Pleasant Twp. .. | Lot #458... | 434.90 | 1.19 | 714 |
| Pleasant Twp. ... | Haddon... | 224.01 | .61 | 366 |
| Conewango Twp. .. | Green... | 2,734.70 | 7.49 | 4,494 |

Appellant is one of the Warren County Commissioners, and, as such, he is a member of the Board of Assessment and Revision of Taxes, hereafter referred to as the "board"; and any action hereinafter referred to as taken by the board refers to the action of the majority, the other two commissioners.

The appeal got off to a wrong start and was twice amended. The matter was before the court preliminarily on preliminary objections and interrogatories but was finally heard by the court on appellant's second amended appeal. As amended, paragraph 1 of the appeal lists the various parcels of oil-producing land owned by appellant, two parcels in Mead Township, four in Pleasant Township and one in Conewango Township, as above set forth, and shows the acreage of four of these parcels. Paragraph 2 reads as follows:

"2. That for the year 1966, the Warren County Board of Assessment and Revision of Taxes has assessed said property as oil production at $600.00 per barrell".

Paragraph 3 refers to the original appeal, and paragraph 4 reads as follows:

"4. Your Petitioner desires to amend his petition to aver that said assessment is erroneous and oppressive in the following regards:

" (a) improper standard of valuation

" (b) overvaluation of property

" (c) said assessment should not exceed $240.00 per barrel".

The fifth and final paragraph avers that the objections stated were raised before the board of revision, but, due to inadvertence, they were not raised in the original appeal. The appeal then requests the court "to strike said assessment 'Oil Production $600.00 per barrel' or, in the alternative, determine the market value of said oil per barrel, from which a proper assessment may be determined".

The evidence shows that gas production is not involved in this appeal; that owners of oil-producing property report to the chief assessor in July the total production in barrels from each oil-producing parcel of land for the preceding 12 months; that this figure is divided by 365 to arrive at the average daily pro-

duction from the property in barrels, and that the average daily production is then multiplied by $600 per barrel to arrive at the assessed valuation of the parcel.

The procedure followed at the hearing on the appeal was that required by law. This is set forth in this court's opinion in Tax Assessment of Edward R. McLaughlin, 58 Nov. 1959, opinion no. 2, and also in this court's opinion in the matter of the Assessment of Premises at 201 McPherson St., Nov. 1959, no. 40, opinion of July 16, 1962, beginning on page 8 as follows:

"Appeals to the Court of Common Pleas attacking a tax assessment are de novo. The court is a fact-finding body: Park Drive Manor Tax Assess. Case, 380 Pa. 134, 136. From the facts before it, the court has the duty of determining a just and equitable assessment for appellant's property: Traylor v. Allentown, 178 Pa. 489, 493. As the law governing tax assessments is statutory, the court, in performing its duty, is bound and limited by the Fourth to Eighth Class County Assessment Law of 1943, as amended, 72 PS §5453.101 et seq., as are all assessing authorities: Philadelphia & Reading Coal and Iron Co. v. Northumberland Co. Comms., 229 Pa. 460, 466. Section 602 of the act, as amended, provides that 'real property shall be assessed at a value based upon an established predetermined ratio (50% in Warren County) of its actual value or the price for which the same would bona fide sell' ".

Actual value has been defined by the Supreme Court as market value: Vollmer v. Philadelphia, 350 Pa. 223, 228; Flamingo Apts. v. Bd. of Rev. of Taxes, 383 Pa. 223, 225. When the assessment record for appellant's oil-producing properties was introduced in evidence by the board, the market value of the properties was established prima facie, and the burden was then

on appellant to show by weight of the evidence that the valuation was unjust, inequitable and not made on a proper legal basis. See Philadelphia and Reading Coal and Iron Co. v. Northumberland Co. Comms., supra.

Following this procedure, the board called its chairman, D. H. Lay, as a witness. He identified a resolution, adopted by a majority of the board on September 9, 1965, placed in evidence as board's exhibit A, which provides as follows:

"The assessment for the year 1966 upon all oil and gas producing properties and the market values thereof shall be established as follows:

"(a) The market value shall be ascertained by multiplying the latest reported daily average production of oil property as expressed in barrels per day by the sum of $1,200.

"(b) The assessed values of such properties for the year 1966 shall be one-half of market value".

There was also placed in evidence a stipulation showing information in regards to appellant's seven parcels of oil-producing properties, some of which does not appear on the assessment roll, as follows:

| | | | | | |
|---|---|---|---|---|---|
| Mead | 459-460 | 500 | Fee | 8.144 bbl. | $ 4,886.40 |
| Mead | 470 | 200 | leasehold | | |
| | | | ⅞ths w.i. | 17.02 bbl. | 10,212.00 |
| Pleasant | 471 | 200 | leasehold | | |
| | | | ⅞ths w.i. | .056 bbl. | $3.60 |
| Pleasant | 472 | 100 | leasehold | | |
| | | | ⅞ths w.i. | .255 bbl. | 253.00 |
| Pleasant | 458 | 250 | leasehold | | |
| | | | ⅞ths w.i. | 1.192 bbl. | 715.20 |
| Pleasant and Watson | Haddon Lots 506, 507, 508 & 517, 700 | | fee | .614 bbl. | 368.40 |
| Conewango | Greene lease | 110 | leasehold | | |
| | | | ⅞ths w.i. | 7.49 bbl. | 4,494.00 |

More information in regards to appellant's seven parcels of oil-producing property is shown in the fore-

going columns than appears on the assessment roll hereinbefore shown. The second column shows that some of the parcels extend into more than one lot. Parcel No. 6 extends into four lots and also into Watson Township. However, as no oil is produced from the portion in Watson Township, this is not involved in the present appeal. Column no. 2 shows the total acreage of each of the seven parcels. Column no. 4 shows the type of appellant's ownership, to wit: the first parcel and the sixth parcel are owned by appellant in fee, and the other parcels are held by appellant under oil and gas leaseholds, which means that seven-eighths of the oil produced, commonly called the working interest, belongs to appellant, and one-eighth of the oil produced belongs to the landowner or lessor, called the royalty. In effect, the royalty is the rental paid by appellant under the terms of the leases. The total oil production in barrels for one year is not shown above, but column no. 5 shows the average daily production in barrels, as does the assessment roll obtained by dividing the total annual production by 365.

There is no conflict concerning the facts above shown as to the seven parcels of oil-producing property assessed to appellant. His objection is only to the fact that the average daily production is multiplied by $1,200 to determine market value (multiplied by $600 under the uniform 50 percent ratio adopted by the county, to produce assessed valuation). To give some information as to how the figure of $1,200 was arrived at in determining market value of oil-producing properties, Mr. D. H. Lay, chairman of the board, testified that the board employed Henry Fuellhart, an experienced engineer and appraiser familiar with oil-producing properties in Warren County. He arrived at the figure of $1,200 per barrel of the average daily production by using a formula similar to that used in other counties.

When the fact of assessment was thus produced in evidence, the fair market value and just assessment of appellant's properties was proved prima facie, and the appellant then had the burden of showing that the valuation was unjust, inequitable and not made upon a proper legal basis. To fulfill this burden, appellant called as witnesses Fred Lenkner, Chief Assessor of Warren County, John DePetro, a petroleum engineer who frequently appraised oil properties in McKean and Warren counties, Mr. Gray, District Superintendent of Quaker State Refining Company which purchased the oil, and the appellant himself. The board called witnesses in rebuttal, to wit: L. L. Crippen, the member of the board who acted with Mr. Lay in increasing county assessments of oil-producing property from the 1965 figure of $240 per barrel of daily average production, to $600 per barrel; Mr. Lay, who gave some background as to the reason Mr. Fuellhart was employed by the board, and Henry W. Fuellhart, who testified at some length concerning the work he did when employed by the board and the factors he considered in using the formula. The final witness was Mr. Crippen again, who testified that Mr. Fuellhart's formula was not actually used in valuing any oil-producing property, but was used to determine whether the figure of $1,200 was fair and not more than the market value of any oil-producing property.

At the conclusion of the hearing, counsel made oral argument to the court and later briefs were filed. The arguments and briefs of counsel have been carefully considered by the court and the matter is now ready for decision.

The evidence produced some interesting facts in regard to the present oil boom in Warren County and the considerable increase in oil production caused by hydrofracting new wells in proven territory or old

wells which have produced oil for many years and from which the production is small. The highly speculative nature of the oil business was also made clear. Even when oil is located underground by means of core tests, the value of such oil in place is highly speculative because of the cost of drilling down to the rock (called oil sand) where it is located, and the uncertainty as to the exact quantity of oil which can be brought to the surface where it can be sold. The surest method of determining the value of any oil-producing property is to pump the oil to the surface. Even then, an evaluation of the property is speculative because of the uncertainty as to the length of time over which any definite amount of oil can be produced.

The evidence also shows that, because of the speculative nature of any venture in the production of oil, sale prices for land from which oil is produced, or from which the buyer hopes to be able to produce oil, reflect the speculative nature of the business and are a very poor basis for determining a market value which will equalize tax assessments. Another peculiar feature of the oil business is that land from which the buyer hopes to produce oil, or hopes to increase the production where some production already exists, is not sold to the hopeful oil producer for a price reflecting its market value, but is leased to him. Oil and gas leases customarily give the lessee the exclusive right to drill for and produce oil and gas, together with the right to use all necessary surface of the land, provided he does not unreasonably interfere with surface use by the lessor or land owner. However, while the lessee may pay a bonus for the lease when his prospects for producing oil are good, he does not purchase the lease in the ordinary sense, but agrees to pay one-eighth of the oil produced as rental. Therefore, what the land owner hopes to obtain from a lease of his property

depends upon the amount of oil produced. Once oil has been located and successfully brought to the surface, or existing production has been increased by hydrofracting or some other means of secondary recovery, the value of the property goes up, and the increased value is directly proportional to the amount of oil produced or the increase in production accomplished by hydrofracting. Five of the seven parcels of land involved in this appeal are leaseholds by which appellant owns the exclusive right to produce oil and gas and pays one-eighth of the oil produced to the land owner. The other two parcels are owned by appellant in fee.

For approximately 100 years, it has been held that oil and gas are minerals and when title to the same is severed from the surface of the land, by a conveyance of the oil, gas and minerals, a reservation of the same when the surface is sold, or a lease granting the exclusive right to drill and produce, an estate in land is created which may be taxed. See Rockwell v. Warren County, 228 Pa. 430. Both the lessor and the lessee have an assessable interest in the oil and gas in and under the land. The assessment may be in the name of either party or both parties according to their respective interests. See Baird's Appeal, 334 Pa. 410, affirming, per curiam, Judge Parker's opinion in 132 Pa. Superior Ct. 573. In the instant case, three of the five properties under lease to appellant are assessed to appellant as to a seven-eighths interest and to his lessor as to a one-eighth interest. For the other two properties, the entire assessment of the oil, gas and minerals, an estate in land subject to taxation, is assessed to appellant.

In Warren County, when oil, gas and minerals have been severed from surface ownership by lease or otherwise, but no production has been obtained, because

no wells have been drilled or those drilled have proved to be "dry holes", the market value established for tax assessment purposes is the nominal value of $2 per acre. This results in an assessed valuation of $1 per acre under the uniform 50 percent ratio adopted in this county. Appellant, of course, makes no objection to this method of assessment to him. It is eminently fair and reflects the fact that the value of land from which it is hoped oil will be produced depends upon the amount produced.

The basic difficulty with the position taken by appellant in this case is disclosed by his pleadings and the arguments in the brief filed on his behalf. The original appeal objects to the assessments on the ground that (a) there is no act of assembly which allows or provides specifically for taxation of oil, and (b) there is no act of assembly which allows or provides for the assessment of oil production. The first amended appeal recites the foregoing averments, and states:

"Your Petitioner desires to amend his Petition to aver that said assessment is erroneous and oppressive in the following regards: (a) Improper standard of valuation, (b) Overvaluation of property, (c) Said assessment should not exceed $240 per barrel".

The second amended appeal lists the seven assessments appealed from and avers that the board "has assessed said property as oil production at $600 per barrel". The prayer for relief requests the court "to strike said assessment 'oil production $600 per barrel' or, in the alternative, determine the market value of said oil per barrel, from which a proper assessment may be determined". In his brief, appellant's counsel argues that the method employed in assessing oil producing properties in Warren County is fair but illegal. The argument avers that only oil in place is a proper subject for taxation, but it would be too costly to determine the amount of oil in place by a core

analysis. But even if the amount of oil in place were known, "this would result in an exhorbitant tax on many oil properties not yet in production, or else being held for a reserve". Appellant does not object to the fairness of an assessed valuation based on oil actually produced. In fact, he objects to the idea of estimating market value from the prices paid for land in the open market. In this connection, the brief says:

"It is our argument that oil producing properties do not have a prevailing market value. Practically all oil producing properties have been discovered and developed under a leasing operating agreement. . . . In the few recent instances where an oil property has been sold, there has been present more speculation than common sense facts. If the taxing authorities follow the few instances of sales available, the result could be disastrous taxwise to all producers in general. In the case of Blain Mead's purchase of Lot No. 460 for a speculated price of $65,000, a tax using the price as a criteria of value would easily soon exceed the income. . . . In conclusion of this paragraph, we argue the rules of market value cannot apply to oil producing property which leaves the matter for the legislature as hereafter argued".

Assuming, erroneously, that the assessments appealed from are assessments on oil production and not on an estate in land, appellant's counsel concludes this portion of his argument with the statement that: "It seems only equitable and fair that oil production only be taxed. Yet, this is for the legislature and not for the courts". There is no merit whatsoever to appellant's argument. It is based on a misconception of the nature of the assessment. In fact, this argument was not pressed at the hearing, the main thrust of appellant's objection to the assessments being based on his claim that, although the method used in assessing oil-

producing properties in the county is fair and equi-table, the average daily production from appellant's properties should not be multiplied by $600 to arrive at assessed valuation, but by $500, $511 or $550. In arriving at these figures, appellant has used the for-mula which was developed by Mr. Fuellhart, but he has substituted some of his own figures.

The formula is as follows:

$$2.5 \left[\left(\frac{\text{total annual production in Warren Co.}}{\text{number of producing wells}}\right) \times \begin{array}{c}\text{(price of crude}\\\text{oil per bbl.)}\end{array} - \begin{array}{c}\text{annual operating}\\\text{costs per well}\end{array}\right]$$

This formula produces a dollar value per well, and when this figure is divided by the average daily pro-duction per well, obtained by dividing the total aver-age production per well in barrels by 365, the result is the value of daily average production in barrels.

The figures obtained by Mr. Fuellhart for total annual production and for the number of producing wells were those supplied by the Geological Survey of the Department of Internal Affairs for the year 1959. The annual operating cost per well used by Mr. Fuellhart is $272. The price of crude oil per barrel, used by the parties, is $4.35. Using the figures origi-nally used by Mr. Fuellhart, which are those appearing in his deposition, the formula works as follows:

$$2.5 \left[\left(\frac{525,000}{600,000} \times 4.35\right) - \$272.00\right] = \$300 \text{ per well.}$$

Dividing the total annual production in barrels by the number of producing wells gives the average production in barrels per year, or 90, and this figure divided by 365 gives the daily average production in barrels, or .24. Dividing the $300 figure (value per well produced by the formula), by .24, the average daily production, gives the value per barrel of the daily average production, $1,220 using these figures.

Appellant's witness obtained from the Pennsylva-nia Geological Survey a statement showing the num-

ber of wells in Warren County and the total annual production for each year from 1948 through 1964. The production shows a steady increase each year for the past ten years. Appellant's witness used the figures for 1964, to wit: total annual production 653,389; number of wells 8,358. For annual operating costs per well he used $295 whereas Mr. Fuellhart used $272. Using these figures produces a daily average barrel value of $500. When Mr. Fuellhart testified at the hearing, he had the advantage of the current figures shown in the statistics of the Pennsylvania Geological Survey, and he projected these to date, and used the projected figures in the formula, to wit: 725,000 for annual total production, and 7,250 for total number of active wells. The result is $1,500 for each barrel of average daily production. The increased production from fewer wells is amply justified on the evidence. This is due to the hydrofracting process now in use in Warren County. Mr. Gray, whose company purchases 90 percent of the oil produced in Warren County, testified as to the steady increase in the amount of oil purchased. He said that in 1965, the amount purchased was two to three times more than had been purchased in 1961, and that this was mostly due to hydrofracting.

The chief dispute between Mr. Fuellhart and Mr. DePetro seems to be in the estimated average operating cost per well. Mr. Fuellhart estimated the average operating cost per well at $272, and Mr. DePetro used a figure of $295. However, it was clear from the evidence that Mr. DePetro included items which, in the court's opinion, should not properly have been included. He included depletion, drilling and development costs. If these are taken out of appellant's operating costs, the result is an average operating cost per well of only $205. Mr. Fuellhart testified that he

had been conservative in the oil producer's favor by using a figure of $272 and this seems to be the fact. Appellant has not attempted to show that any of his seven assessments of oil-producing properties are in excess of 50 percent of the fair market value of the property. The reason for this is clearly shown in the evidence. In December of 1964, appellant purchased the 500-acre property in Lots 459 and 460 in Mead Township for $65,000. The market value for this property as fixed by the board is $9,780. Thus, appellant actually paid six times the amount which the board used as an estimated market value of this property. Also, the Haddon property, in Pleasant and Watson Townships, 700 acres in fee, was purchased by appellant in 1964, for the sum of $15,000, whereas the market value used by the board in fixing the assessment is only $733.

The petroleum engineers who testified on both sides in this case, Mr. DePetro for appellant and Mr. Fuellhart for the board, stated that they investigated sale prices of oil-producing properties as shown in the recorder's office on deeds and other instruments transferring title, and that they found the prices actually paid were higher than market values estimated by multiplying the average daily production in barrels by $1,200. Mr. Fuellhart found sale prices were two to five times the $1,200 daily average barrel market valuation established by the board.

Other evidence justifying the market values for appellant's properties as established by the board was given by appellant's expert, Mr. DePetro. After testifying at some length about the formula and the figures he applied in using the formula, and also stating that appellant paid more than the property was worth in the two cases where a sale price was known, Mr. DePetro was asked by appellant's counsel to state his

own opinion as to market value of appellant's oil-producing properties. The following table shows De-Petro's opinion as to market value, sale price where known, and the market value established by the board for each of appellant's seven properties:

| Property | DePetro Opinion | Sale Price | Board Valuation |
|----------|-----------------|------------|-----------------|
| 459—460  | $18,400         | $65,000    | $ 9,772.80      |
| 470      | 24,000          | .....      | 20,424.00       |
| 471      | 1,500           | .....      | 67.20           |
| 472      | 1,200           | .....      | 306.00          |
| 458      | 3,000           | .....      | 1,430.40        |
| Haddon   | 2,500           | 15,000     | 736.80          |
| Green    | 7,200           | gift       | 8,988.00        |

For each of appellant's properties, except the Green property in Conewango Township, a leasehold on 110 acres, the opinion of appellant's witness as to market value is considerably higher than the market value established by the board. In explaining how he arrived at his estimates of market value, Mr. DePetro said that he determined the approximate settled production from each of the properties and then multiplied daily average production by $2,000. Obviously, his estimate of market value for each of the properties is geared to the amount of oil produced. Of course, this is also true of the market values established by the board.

On page 373, supra, the board's resolution in regards to assessing oil-producing properties is quoted insofar as it refers to the actual assessments. The first part of the resolution gives some of the background for the action taken. It reads as follows:

"WHEREAS, the Board of Assessment and Revision of Taxes of the County of Warren, Commonwealth of Pennsylvania has been requested by several school districts and municipalities within the County with the object of raising the assessment thereof to make the same more equitable when compared to assessments of other properties, and

"WHEREAS, this Board has made such an investigation and has come to the conclusion that the assessment of oil and gas producing properties should indeed be raised, and

"WHEREAS, this County and surrounding counties have for many years determined market and assessed values by multiplying the average daily production of the property by a dollar figure, and

"WHEREAS, this Board believes that the continuance of such a practice is a most fair and equitable means presently within their means to establish such values".

Both members of the board testified that they studied assessments of oil-producing properties in surrounding counties; that they came to the conclusion that assessed valuation in Warren County should be increased, and should be based on a market value of $1,200 per daily average barrel of production; that Mr. Fuellhart was employed by the board to conduct a study and to see whether the $1,200 figure was fair and not in excess of market value; and that Mr. Fuellhart reported that $1,200 times daily average barrel production resulted in a figure which was considerably less than actual sale price and was less than appraised valuations made in the customary fashion. His formula is not applied to each oil-producing property to determine market value. The chief result from the development and use of the formula is a fair and equitable equalization of assessments on all properties producing oil in Warren County.

As it is impossible to base assessments on the prices paid for oil-producing properties, or for properties from which it is hoped oil will be produced or production increased, most of said properties being not purchased but leased, and when purchased, highly speculative prices are paid, it then becomes vital to equalize assessments in some fair and lawful manner.

In Traylor v. Allentown, 378 Pa. 489, which dealt with assessment of a hotel property for which there was no market and no sales of comparable property, the court said, at page 494:

"Actually, there was no competent evidence whatsoever adduced at the hearing in the court below as to the fair market value of the property. In that situation, the court was confronted with the duty of equalizing the assessment and making it harmonize with the assessments of other properties within the taxing district. In Cumberland Coal Co. v. Board of Revision of Tax Assessments, 284 U.S. 23, 29, which involved a question of equalizing assessments of lands in Pennsylvania, Mr. Chief Justice Hughes said, '. . . where it is impossible to secure both the standard of the true (i.e. actual) value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law'. We lately quoted the foregoing principle with approval in Hammermill Paper Company v. Erie, 372 Pa. 85, 190, 92 A. 2d 422. See also Allentown's Appeals, 147 Pa. Super. Ct. 385, 388, 24 A. 2d 109. And, such was precisely the course which the learned court below pursued in arriving at a just and equitable assessment".

As all parties agree, and as the evidence before the court shows, the board could not base assessments of oil-producing property on the occasional and highly speculative prices paid for such property, without being grossly unfair to the property owners. The evidence in this case does not show that a market value of $1,200 times the average daily production from the property in barrels results in a market value higher than prices actually paid. In fact, the prices actually paid are very much higher. Nor does it appear from the evidence that the average daily production in barrels, multiplied by $1,200, will produce a market value

which is unjust, inequitable or not made upon a proper legal basis. Therefore, as appellant has the burden of proof and must show by the weight of the evidence that the valuation adopted by the board is unjust, inequitable or not made upon a proper legal basis, he has failed to sustain that burden in the instant case. The assessed valuations set by the board must be upheld and the appeal therefrom must be dismissed. Wherefore, the court makes the following order:

## ORDER

And now, June 27, 1967, for the reasons stated in the foregoing opinion, and pursuant to the authorities there cited, and upon consideration of the arguments and briefs of counsel and the entire record in this case, and the court being satisfied that Blain M. Mead has failed to show by weight of the evidence that the assessed valuations on his oil-producing properties, established by the Warren County Board of Assessment and Revision of Taxes as hereafter set forth, are unjust, inequitable or not made upon a proper legal basis, therefore, it is hereby

Ordered and decreed that the following tax assessments to Blain M. Mead are sustained and his appeal from the assessed valuations is dismissed, to wit:

| Property | Total Production | Daily Aver. | Assessed Valuation |
|---|---|---|---|
| MEAD TOWNSHIP | | | |
| No. 460 | 2,972.71 | 8.15 | $ 4,890 |
| No. 470 | 6,212.41 | 17.02 | 10,212 |
| PLEASANT TOWNSHIP | | | |
| No. 471 | 20.45 | .06 | 36 |
| No. 472 | 93.07 | .26 | 156 |
| No. 458 | 434.90 | 1.19 | 714 |
| Haddon | | .61 | 366 |
| CONEWANGO TOWNSHIP | | | |
| Green | 2,734.70 | 7.49 | 4,494 |

Costs to be paid by appellant.